Good morning. My name is Rhoda Wilkinson-Domingo, and my associate, Horencio Valcarcel, we're here to represent Julio Izquierdo. Mr. Izquierdo was born in Peru in 1964. He was recruited to the National Guard, and on his first mission of live combat, after he'd been trained for three months, completed his training when he was only 23 years old, he was called upon to quell a riot at a prison that was led by Sendero Luminoso. After the National Guards went in shooting, after the riot was quelled, Mr. Izquierdo felt sick to his stomach. He had a visceral reaction to what was happening, and he went to the bathroom. He left and went to the bathroom. While he was gone, officers ordered prisoners to be shot and massacred. When he returned, he was horrified at what happened. The Peruvian government investigated the event. They charged everybody there with murder, and they found that he was not guilty. He was not an officer that ordered this event. He did not participate in the event, and he did not see the event. He was found not guilty, acquitted. Sendero Luminoso was a brutal group or is a brutal group in Peru. They feel that capitalism is morally wrong, and they're very vengeful. Mr. Izquierdo saw how one of his, the men that he was trained with, was pulled apart by tying the head of the man. Counsel, your argument doesn't go to the question of asylum. Okay. The Board of Immigration Appeals came up with three new facts that were not. All right. You're really focusing here on the adjustment of status question. Is that correct? No. The order was that the Board of Immigration Appeals saw the case, or reviewed it de novo, and they looked at the facts and the findings, and they kind of changed some of the facts. Right. But the facts that you just cited about him being found not guilty were facts that were cited in the section of the BIA's opinion that dealt with adjustment of status. So is that where you're focusing your argument right now? Not exactly. I want adjustment of status for this client, but I was saying that they invented three new facts, or the way they worded it, it seems like three new facts to me. Okay. What are the new facts that they invented? That he witnessed a human rights violation, that he did not make a token effort to stop the situation from happening, and that he was a highly trained officer. He did not witness the massacre. He left because he was sick to his stomach. He had to go to the bathroom. He testified to that. He did not see it. The immigration judge that saw him eyeball to eyeball, looked at his demeanor, felt that he was credible, granted both adjustment of status and political asylum. He did not witness. He was you said that he was sick to his stomach and horrified, so he went to the bathroom. So he must have known what was going on. Well, he wasn't sure. He didn't give the order. He wasn't sure what was going to go on. They were cursing a very unusual way. I mean, it's in the record. Everybody was cursing. They were very upset and they were ordering the prisoners out into the yard and he left. So he wasn't sure what was going to happen, but he does say that something monstrous was about to occur, he felt, but he didn't know that. He was a corporal and these officers were higher rank than he was. The second thing the Board of Immigration said was that he did not make a token effort to stop the situation. Well, he was never asked in court if he ever made a token effort. The BIA came up with that on their own. Isn't that obvious from the facts? I don't think so. From the story that he tells, it's pretty obvious. I think that all that is is just an observation that he didn't do anything to try to  I think that's a permissible inference from the facts that he describes. He got sick to his stomach. He left. When he came back, all the prisoners had been shot in the head. He was never asked if he ever tried to stop it or make a token effort. I guess what's troubling me, if your principal argument is the fact finding by the Board, this argument appears to have been made in a petition for rehearing in this case. Yes, Your Honor. When was it made raised to the Board? Well, it was mentioned when we appealed it to the BIA, saying that they had No, no, no. You don't mean that. You don't mean it was mentioned when you appealed to the BIA, because Well, excuse me. When we, right, when we appealed from the BIA to the Ninth Circuit, we mentioned that they had mentioned things that were not in the record, that they exceeded what was in there. Well, that was when you first mentioned it to this Court. Right. When did you tell the BIA that it had violated the regulations? We didn't go back to the BIA. We went to here. And then the third fact that they say is You did file a motion to reconsider and remand, right? Is that right? I think The error that you're citing came in a 2005 opinion by the BIA. There's a 2006 opinion by the BIA. And it mentions we will deny a motion to reconsider and remand filed by the Respondent. Did you raise this issue before the BIA? I'm not sure. I have to look at the record. The third fact that they said that he was a highly trained officer. He had just completed training three months before this. This was the first time that he was in live combat. And he was a corporal. He wasn't an officer. The officers made the decisions. He was trained not to contradict officers and do what they said. However, he did leave. So we're asking this Court to remand the case to the BIA with instructions to affirm the original immigration judge's decision, who saw him and properly granted adjustment of status in political asylum, or alternatively, due to the passage of time, we seek the case be remanded to the BIA with instructions to the immigration judge for new findings of fact in order to ask Mr. Esquerdo if he ever made a token effort to stop. Counsel, the reason I asked you about whether these facts went to adjustment of status, which is the way that I read the Board's order, is that in that same section, the Board observes that your client has difficulty following the laws of the United States and observes that he's had contact with the police, including a theft, violence, that he spent some time in jail, and that it would deny his adjustment of status as a matter of discretion. Now, how do we have jurisdiction to review a matter of discretion, and what should we do with that fact, which seems to be independent of anything that happened in Peru? Well, he doesn't have any convictions. It's true he's been arrested twice, once for petty theft and they didn't have enough to convict him, and once for simple battery, and he did diversion and that was dismissed. So they violated their to review their for discretion, they violated their authority, because he doesn't have anything, he doesn't have any convictions to things when he was arrested and they were dismissed. And he's married to a U.S. citizen for the past 12 years, they've been together 16 years, he's paid his taxes, he's paid child support the entire time. But all of those go to questions of discretion by the board. How do we have jurisdiction to review the exercise of discretion by the board? I'll rebut that. Let me think about that and I'll come back to it. You have a minute and a half remaining. Would you like to reserve your time? Yes, please.  It's here from the government. May it please the Court. Carol Federighi on behalf of the Respondent, the government, in this case. The board did not improperly engage in fact-finding in Mr. Ischiardo's case. The board's conclusion that Mr. Ischiardo witnessed a major human rights violation unfold was permissibly based on facts found by the immigration judge, which show that Mr. Ischiardo did see the unfolding of the events. And I'm focusing here on the board's use of the word unfolding. That's a pretty capacious word, isn't it, unfolding? Exactly. The development. Yes, the development. And he did, as you pointed out earlier, there was undisputed evidence in the record. Mr. Ischiardo himself repeatedly admitted that he saw the soldiers take out prisoners from the prison after the riot had been suppressed and that he felt that something monstrous was going to occur, in fact, that he believed they were going to kill the prisoners, and that's why he left at that point. What should he have done? He's been on the job for three months. He's 23. He's got generals. He has generals present. Definitely a difficult situation for him. His buddy's head has just been blown up. He's fired. They've fired in self-defense. He admits that he's hit somebody, one of the prisoners, so he's killed at least one prisoner, but it was in self-defense. Nobody's questioning his right to do that under those circumstances in the prison riot. But what should he have done in this situation? Well, the board pointed out that he did not make any attempts to prevent the massacre. I don't know. I'm not sure what he could have done at that point, but certainly he could have made some sort of action or taken some action to indicate that he did. This is like watching a train wreck occur in front of you. The board also said he made no effort after the fact to report the incident or to discuss it with anyone, to bring it to anyone's attention. I want to also point out that the immigration judge was considering his actions in the prison in conjunction with whether he was subject to the persecutor bar for asylum. In contrast, the board did not reach the issue of persecutor bar. It didn't consider that at all. It was looking at his actions in the prison in conjunction with his application for adjustment of status and whether he merited that as a matter of discretion. And as Your Honors have already pointed out, the Court lacks jurisdiction to consider how the board weighed the various factors. But we could get it if we think that the board has violated its own regulations by finding facts not found by the I.J. That's correct. We do have jurisdiction to determine if the board used the proper standard of review. And the board did here. The board accepted the facts found by the I.J. What the I.J. said in a paragraph where the I.J. is talking about what Mr. Izquierdo actually saw and heard. He said the I.J. found that he was unaware of the massacre. But by that word, he's actually referring to whether he physically saw, heard, or knew that the massacre was going to take place. He never said he knew. He just suspected or that's what he thought. And that's what the board is going on. Now, he had some kind of idea of what was going on, never took any action to prevent it or report it to authorities or to. But as you stand there, counsel, you haven't been able to answer my question. What should he reasonably have done? I'm not sure that's a real question that the board needed to get into that. What the board is saying is given his involvement in this massacre and the fact that he was at most, you know, at least a passive sort of factor in the massacre, that he does not merit adjustment of status as a matter of discretion. It's up to the board as to how to weigh that factor, that he did nothing, and whether he could have done something else. The court doesn't have jurisdiction to itself determine, well, he could – there was nothing he could have done. Sotomayor, how would you characterize the difference between the I.J. and the board in the way that they viewed the facts? The board view – was looking at whether he actively assisted or participated in persecution for the purposes of the persecutor bar. And when the board said he was not aware of the massacre, the board meant he did not physically see or participate in the massacre, and therefore, he was not subject to the persecutor bar. What the board was looking at is whether he merited – whether because of his involvement in the massacre as sort of a passive witness to the unfolding, whether he merited adjustment as a matter of discretion. And that was one negative factor. The board also took into account his encounters with law enforcement in the U.S. and reasonably balanced those as well. His positive equities were not super strong here. He does have one U.S. citizen child, but he hadn't seen the child in four years at the time of the hearing. So that was not a particularly strong factor. So the board – the board also cited his criminal record, which is pretty thin. Did the board rely on that as a first exercise of discretion? Did it reasonably rely on that? The board did rely on that, whether it was reasonable or not. That, again, is something the court doesn't really have jurisdiction to review. What weight the board gave the criminal record is outside this Court's jurisdiction. Is that an independent ground? So if we thought that the board had gone beyond what it should have done with respect to the – to the Shining Path, the incident, that the criminal actions are sufficient to support the board's judgment? Again, I think you're going beyond where the court's jurisdiction takes you. You can't look at what the board – the factors the board considered and what weight it gave those factors, unless the board, as I said, used the wrong standard of review of the IJ's facts findings, or if it considered a factor it shouldn't have considered, like the person's race or ethnicity or something like that. But it did not do that here. The weight the board gave to the criminal record and to his involvement in the prison massacre, that is outside the court's jurisdiction. And as I said, the board did not improperly go beyond the fact findings of the immigration judge. It just gave those different weights for a different purpose. The IJ did not factor in that for the purposes of adjustment of status. As for the asylum finding, the board also did not gauge an improper fact finding when it concluded that Mr. Isquiero had also not established a well-founded fear of persecution. Its conclusion about a well-founded fear was a permissible legal conclusion concerning whether the facts or the harm found by the IJ, the likelihood that the Shining Path would harm him if he returned to Peru, whether that met the standard of showing that he would be individually targeted for harm. As this Court is aware, an applicant must show that he would be singled out for harm in the country, not just that he might be the victim of random criminal acts. The IJ's findings went to the risk of harm that Mr. Isquiero might face, i.e., that he might indeed be attacked by the Shining Path because they were attacking civilians as well as military and police under the current conditions or conditions at the time of the hearing. What the board was addressing was whether that harm would be on account of Mr. Isquiero's protected characteristic, whether he would actually be singled out for harm by the Shining Path and not just a victim of random criminal violence. And there was no dispute that there was no evidence, recent evidence of individualized targeting of people in Mr. Isquiero's situation. The board did make a reference to events, to the 1990 cutoff, which was a reference to the earlier threat he had received and the death of his colleague. But since 1990, there was no evidence in the record that people in Mr. Isquiero's situation had been individually targeted for persecution by the Shining Path. The board, therefore, held that despite the risk of harm, the probability that he might be the victim of harm from the Shining Path if he returned, he hadn't met the standard for persecution, which requires him to show that he actually would be singled out on the basis of his protected characteristic. I also want to point out that the court – the board did not address the question of whether his claimed particular social group actually was a protected particular social group for the purposes of asylum. And that's, you know, former – if you want to say former Republican Guard officers involved in the prison massacre, maybe that was his group. That's an open issue that if the court did remand, it would – the board would need to address that. Still, if there are no further questions, then, we ask that the petition for review be denied. Thank you. Roberts. Thank you, Ms. Federighi. Ms. Domingo, you have time reserved. So the BIA's decision is contrary to law because they came up with new facts. He did not have any convictions, and they went beyond what is contrary to their decision in a matter of R.V. Quinn, 21 INA Decision 38, when they go beyond their – they exceed their authority deciding what the facts are. And we did bring it up in the petition for review. It's on page 13. We said that the BIA made a legal error when they concluded that he witnessed a human rights crime unfold and that he failed to make even a token effort. We mentioned that. That's in your brief. Yes, on page 13. Ms. Domingo, the last point the government made you haven't addressed, and that's this objective – objectively reasonable fear of persecution or probability of torture. What about that? Well, he – his colleague was killed, like I said, with two horses, and so he was extremely afraid after that. Shining Path has been – the man who started it was put in jail, but he's run things from – out of jail. It's gone up and down. It changes all the time whether the Shining Path is still out there. They are. A lot of Peruvians tell me that they're still afraid of people in the Shining Path. I've heard horrific things. So I think it should be remanded for fact-finding if that's an issue. But it should be granted for adjustment. Thank you, Your Honor. Thank you, both counsel, for the argument. The case is submitted.
judges: Battaglia, Schroeder, Bybee